JOHN BALDWIN, APPELLANT, *v.* CHARLES ELY.

Certificates were issued by the Treasury Department, under a treaty with Mexico, which were payable to a claimant or his assigns upon presentation at the Department.

These certificates being legally assignable under an act of Congress, an indorsement in blank by the original payee was always considered sufficient evidence of title in the holder to enable him to receive the amount of the certificate when presented to the Treasury Department for payment.

The possession of them with a blank indorsement is *primâ facie* evidence of ownership.

Where a complainant in chancery alleged that they had been purloined from him, and the defendant alleged that he had received them from a third person in the regular course of business, the claim of the complainant, who furnished no proof that they had been purloined, to have them restored to him unconditionally, could not be maintained.

The bill was one of discovery, and the defendant, in his answer, alleged that he had received them from the third person as security for money loaned.

The complainant was entitled to have them restored to him upon his refunding to the holder the amount of the loan for which they had been deposited as security. It was error, therefore, in the court below to dismiss his bill.

But as the complainant did not offer to redeem the certificates, but insisted upon their unconditional restoration, the defendant below is entitled to costs in the Circuit Court. But the plaintiff below, who was the appellant here, is entitled to his costs in this court.

THIS was an appeal from the Circuit Court of the United States for the District of Columbia, in and for the County of Washington, sitting as a court of equity.

Baldwin *v.* Ely.

The facts were these.

The matters in controversy arose out of three certificates, No. 989, No. 990, No. 991, for $1,000 each, bearing interest at the rate of eight per cent. per year, issued from the Department of the Treasury of the United States to the appellant, in pursuance of the convention of 11th April, 1839, between the United States and the Mexican republic, and two acts of the Congress of the United States to carry into effect that convention, passed June 12, 1840, and September 1, 1841.

Articles 1, 2, 3, 4, and 5 of that convention (8 Stat. at Large, pp. 526 to 533) provided for a commission to hear and determine the claims of the citizens of the United States upon the Mexican government.

By article sixth it was agreed that, if it should not be convenient for the Mexican government to pay at once in money the amount found due by the board of commissioners, it should be at liberty to pay in treasury notes, to bear interest at the rate of eight per cent. per annum from the date of the award, receivable at the maritime custom-houses of the republic.

By the seventh section of the act of June 12, 1840 (5 Stat. at Large, p. 383), the Secretary of the Treasury was required to issue certificates "showing the amount or proportion of compensation to which each person, in whose favor award shall have been made by said commissioners or umpire, may be entitled as against the Mexican government, on account of the claims provided for by said convention."

By sections eighth, ninth, and tenth, the Secretary of the Treasury was required, if the Mexican government should pay any moneys towards satisfying the said awards, to distribute the same ratably among the claimants; or, if the Mexican government should see fit to issue treasury notes, then to cause the same to be delivered "to the persons who shall be respectively entitled thereto in virtue of the awards, and the certificates issued, first deducting such sums of money, if any, as may be due the United States from persons in whose favor awards shall have been made under said convention."

By the act of 1st September, 1841 (5 Stat. at Large, p. 452), the Secretary of the Treasury was required to issue certificates to the persons authorized to receive the sums awarded, "their legal representatives and assigns," in the manner directed by the seventh section of the act of Congress of June 12, 1840, for such portions of the sums awarded as may be convenient for the claimants, and to be subject to the deductions provided for by the tenth section of said act; "provided, that nothing in this act shall be construed to give any rights to the

49 *

claimants that are not conferred by said convention, and the act of June 12, 1840 ; and that the substance of this proviso be inserted in the certificates that may be issued."

The appellant, John Baldwin, obtained two awards from said commission for large sums of money, the one award bearing date 18th December, 1841, the other, 25th February, 1842 ; and therefor obtained various certificates from the Treasury Department for $ 1,000 each, bearing interest at the rate of eight per cent. per year from the respective dates of said awards, whereof the aforesaid certificates, No. 989, No. 990, and No. 991, are parts and parcels.

Subsequent to the date of these certificates, another convention was signed at the city of Mexico, on the 30th of January, 1843, and finally ratified on the 29th of March, and promulgated on the 30th of March, 1843 (8 Stat. at Large, p. 578), by which it was agreed, that the Mexican government should pay, on the 30th of April, 1843, all the interest which should be then due on the awards in favor of claimants ; and that the principal, and the interest thereof accruing thereon, should be paid "in five years, in equal instalments every three months," the said term of five years to commence on the 30th of April, 1843 ; the payments to be made in the city of Mexico, in gold or silver, to such person as the United States should authorize to receive them.

Such were the effects, conditions, and obligations arising against the United States out of the afore-mentioned certificates.

In March, 1844, the appellant exhibited his bill in equity against the appellee, stating in substance, that, being the lawful proprietor of said three certificates, No. 989, No. 990, and No. 991, to him issued in pursuance of the awards in his favor, he wrote his name on the back thereof, "without any words of transfer or assignment, and still continued to hold the same as the lawful owner thereof ; and that, while the same were thus held by him, the said three certificates, No. 989, No. 990, and No. 991, each for the sum of $ 1,000, were either casually lost by him, or, as he verily believes, clandestinely stolen from his rightful possession."

That upon the discovery of said abduction, the complainant immediately gave notice to the Treasury Department, by letter of 12th February, 1843, with a request that payment of those certificates might be stopped.

That the complainant was unable to find where those certificates were, until, by letter of the 29th of January, 1844, from the Secretary of the Treasury, he was notified they were held

and claimed by the defendant, and had been presented at the Treasury Department in the defendant's name. He sought a discovery of Ely's right to them, and prayed that Ely should be required to prove how the said certificates were procured from the complainant, and for what consideration, and when and where; that he be decreed to deliver up the same, and to desist from all demand of payment on account of the same, or to assign or transfer them to any other person or party; for an injunction to restrain him for demanding payment of them until the further order of the court, and for such other and further relief in the premises as might be agreeable to equity and good conscience.

The injunction was granted. Ely answered. He admits that the said certificates were issued and made payable to complainant or his assigns, and were his sole and exclusive property. He states, that in the month of April, 1842, one Perry G. Gardiner, of the city of New York, applied to him for a loan of money, and offered as security three certificates of the Mexican indemnity, similar to those referred to in the bill, issued to complainant, and indorsed by him; but he does not recollect the numbers; and upon these certificates he advanced to Gardiner at different times various sums of money, to the 8th of August, 1842, amounting to $1,220, Gardiner promising to place further securities in his hand. On the 13th of August, 1842, Gardiner brought to him three other certificates for $1,000 each, payable to Baldwin, and indorsed by him, the numbers of which he does not recollect, to be held as security for the sums already advanced, and such new loans as he might thereafter make. And he did afterwards, to the 16th of December, 1842, lend him other sums amounting to $857, making in the whole $2,077. That as to the first three certificates, they were, as he believes, the property of Gardiner; and as to the last, Gardiner, at the time of the deposit, informed him he had full control and right to sell, pledge, or hypothecate them; and he did verily believe that Gardiner was the true *bonâ fide* owner thereof, by regular assignment from Baldwin, and he took the same as he had taken the three previously given him, without any knowledge or suspicion of any fact or circumstance that could affect or invalidate the title of Gardiner to them. He further states on information and belief that Baldwin did in fact indorse the said three last-mentioned certificates in the presence of Gardiner, and hand them to Gardiner, with the express purpose and design that Gardiner should go into the market and negotiate the same, and apply the proceeds to his own use, in payment of moneys due and payable by Baldwin to him; and

he charges the fact to be, that Baldwin indorsed them with the express design and intention of passing, by such indorsement, a perfect title to Gardiner, or to any person to whom Gardiner might transfer them, and thus he gave this defendant the legal right to write over Baldwin's indorsement any words of assignment necessary to give him a perfect title to them ; that some time in the month of December, 1842, Gardiner represented to him that the certificates had greatly increased in value, and that three of them would be sufficient security for him, and requested him to give up three of the six.   He did so, without observing how they were numbered ; and, some time after, Gardiner again applied to him to exchange the three certificates which he had so given up to him for the other three, and he, knowing no difference therein, received them back, and these three last are now in his possession, and are numbered 989, 990, 991.   He denies all fraud, and claims them as his own.

To this answer the plaintiff filed a general replication.

A commission was issued to take testimony, and under it the evidence of James Bolton and George W. Riggs was taken for the complainant, and that of Perry G. Gardiner for the defendant.

The depositions of Bolton and Riggs need not be further mentioned, as they related chiefly to the exchange of certificates.

Gardiner states that Baldwin had passed to him in payment of a debt several certificates similar to these, three of which he had hypothecated with the defendant, for a loan of money made by defendant to him.   And in August, 1842, Baldwin gave him the three certificates mentioned in the bill for the express purpose of raising money, or by hypothecation to pay him (Gardiner) for services rendered by him to Baldwin ; that Baldwin took them out of his portfolio and indorsed them in his presence, and delivered them to him, and told him to get the money as soon as possible ; that he took them directly to Mr. Ely, got some money on them, and he agreed to advance further sums, which he afterwards did advance ; that he told Mr. Baldwin he had raised the money on these certificates.   He states further, that in the month of December, 1842, he obtained from Mr. Ely the first three certificates, leaving the three mentioned in the bill in the hands of Mr. Ely, and sold them to Perkins Nicholls, a broker, and afterwards, 14th June, 1843, got them from E. Riggs, to whom Nicholls had sold them, and returned them to Ely.   That Baldwin had advertised these three certificates as having been stolen from him, and witness called on him and asked him the meaning of it.   He said it was to

frighten Mr. Sayre and Mr. Allen, who held the five other certificates mentioned in the advertisement; that he would, as soon as he could raise the money, pay off Ely's advances, and take up the three certificates in controversy. Ely never has been paid.

The cause was set for hearing by consent on the bill, answer, exhibits, depositions, and general replication, and on the 25th of May, 1846, the Circuit Court passed the following decree:—

"This cause coming on to be heard on the bill, answer, and exhibits filed therein, and the complainant, by his counsel, objecting to the admissibility of the evidence of Perry G. Gardiner, whose deposition was taken in the said cause; and this court having heard the argument of counsel, and considered the said cause, the said objection to the admissibility of the said evidence is hereby overruled; and it is, this 25th day of May, 1846, ordered, adjudged, and decreed by the court, that the said bill be, and the same is hereby, dismissed, and that the complainant do pay to the said defendant his costs herein, to be taxed by the clerk of this court."

From this decree the complainant appealed to this court.

It was argued by *Mr. Bibb*, for the appellant, and *Mr. Bradley*, for the appellee.

*Mr. Bibb* examined the case under two points of view.

1st. If Gardiner's testimony should be admitted:

2d. If it were excluded. (The argument under the first head is omitted.)

2. The deposition of Perry G. Gardiner must be considered by this court as suppressed for interest and incompetency, upon the exception taken to it in the Circuit Court.

The case of the defendant, divested of the deposition of the interested witness (Gardiner), is bald; his defence is without proof, and he stands before the court in no better condition than as a finder of these lost or purloined certificates.

The bill alleges the awards of the board of commissioners in favor of the appellant, the issuing of these certificates to him in pursuance of the awards and the acts of Congress, and his possession thereof as of his own property. The answer admits those matters of the bill, but sets up matters by way of avoidance, to which the plaintiff put in the general replication. It behooved the defendant to make out by proof whatever was insisted on by way of avoidance. (Bull. N. P. 237.)

This is according to the established course in chancery. If the answer of a defendant, as to matter alleged by way of

avoidance, and after a general replication, were to be taken as true without proof, then a suit in equity would be but little better than a mockery. Any hardened defendant, if not required to prove what he alleged in avoidance, could swear himself clear.

The appellee has no assignment to himself; he does not pretend to any thing more than that Perry G. Gardiner deposited the certificates as collateral security for money lent. Take away the deposition of the interested witness, Gardiner, and every matter set up by the defendant's answer in avoidance of the plaintiff's title to the certificates, issued to him, apparent on their face, and confessed by the answer, rests wholly in the allegation of the answer, without proof. The defendant is without proof that he lent Gardiner any sum, even a cent, upon these certificates. The defendant is without proof that he gave value for them, or how he came by them.

It appears from the depositions of Mr. Bolton and Mr. Riggs, that the possession of these certificates, now relied on by the defendant, must have been acquired on or after the 21st of June, 1843, after they were advertised by the appellant as having been lost or purloined, and after notice thereof had been given in the Department of the Treasury of the United States.

The defendant, in his answer, avers and charges, upon information which he believes to be true, " that the said complainant did in fact indorse the said three last-mentioned certificates," (meaning those which he says Gardiner delivered to the defendant on the 13th of August, 1842,) " in the presence of the said Gardiner, and hand the same to the said Gardiner for the express purpose and design that the said Gardiner should go into the market and negotiate the same, and apply the proceeds to the use of himself, the said Gardiner, in payment of moneys due and payable from said Baldwin to said Gardiner."

This matter, so alleged in avoidance, is totally without any color of proof, save in the deposition of the interested, discredited, incompetent witness, Gardiner himself.

The defendant further says, that he " is informed, believes, and expressly charges the fact to be, that the said Baldwin did indorse said certificates with the express design and intention of passing, by such indorsement, a perfect title to said certificate to the said Gardiner, and to any other person to whom the said Gardiner might afterwards transfer them." This allegation, like the former, is totally destitute of proof, without the deposition of this same interested, incompetent witness, Gardiner, who is swearing to saddle upon the appellant's property the debt of the witness to the appellee for money borrowed,

and of which witness says, "I have never paid Mr. Ely any of the advances made by him on these certificates, and I am still indebted to him for them." Suppressing the deposition of this interested witness, as this court must do upon the exception taken to it in the court below, there is no delivery to Gardiner proved; no bargain, no contract, no consideration, between the appellant, Baldwin, and the witness, Gardiner. The complainant has never assigned them, never received any consideration for them, but charges (upon his oath to his bill of injunction) that these certificates, Nos. 989, 990, and 991, "were either lost by him, or, as he verily believes, stolen from his possession." The defendant alleges that the plaintiff delivered them to Gardiner, "in payment of moneys due from the said Baldwin to the said Gardiner." Take away the deposition of this interested, incompetent witness, Gardiner, and this allegation of the defendant is without proof, either of the delivery or of the consideration alleged.

The defendant "insists that said indorsement was intended to give, and does in law give, the right to this defendant, as the holder thereof, to write over the name so indorsed any words of assignment necessary or convenient to convey a perfect title to himself, and thus carry out the original design of said Baldwin in making such indorsements."

In this the defendant has pleaded and averred, first, an intention and design of the primitive owner of these certificates to transfer his property in them, which is a fact to be proved; secondly, that the original owner has signified his intention and design to transfer his right of property in a manner sufficient in law to effect a transfer.

In discoursing of these matters, to arrive at truth, the surest method is by proceeding from that which is exclusive and negative to that which is inclusive and affirmative. These certificates are not bills of exchange, nor any species of negotiable paper, ruled by the law merchant. They have none of those peculiar privileges allowed to paper negotiable, according to the law merchant, in order to give full effect to their utility as a medium of trade and commerce. These certificates have no resemblance to bills of exchange, or promissory notes made assignable by the statute of Anne "in like manner as bills of exchange." These certificates were payable out of a particular fund, to be furnished by the republic of Mexico to the United States from time to time; and, when so furnished, to be distributed among various claimants, *pro rata*, and subject to the condition expressed in the tenth section of the act of Congress of June 12, 1841. They were not assignable by the common

law.  They cannot be transferred so as to vest an absolute property in the holder, exempted from all question of a consideration given for the transfer, like unto the privilege allowed to bills of exchange, of presumption of a sufficient consideration for the transfer when held by a third person, — a privilege allowed to such papers only as are governed by the law merchant, in order to strengthen and facilitate that commercial intercourse which is carried on through the medium of paper securities, properly denominated mercantile paper, negotiable according to the law merchant; or to such papers as by statute have been assimilated to bills of exchange in their assignable qualities.

The act of Congress of September 1, 1841, made in addition to that of 12th June, 1840, authorized the Secretary of the Treasury "to issue certificates to the persons authorized to receive the sums so awarded, their legal representatives and assigns," in the manner directed by the seventh section of the act of 12th June, 1840; that is, to the assignees of the awards, subject, however, to the conditions and reservations mentioned in both of those statutes.  But neither of these statutes made the certificates themselves, when issued, assignable, much less assignable in like manner as bills of exchange.  On the contrary, the tenth section of the act of 12th June, 1840, and the proviso of the act of 1st September, 1841, repel the idea that Congress intended to convert these certificates into a circulating medium, with assignable qualities, like unto bills of exchange.

They are therefore certificates, under the seal of the government, payable out of the particular fund when provided by the Mexican government, subject to conditions and reservations, having no peculiar privileges in the hands of an assignee beyond bonds at common law, payable to the obligee, his heirs, executors, administrators, and assigns, which are not made assignable by statute, but, like all bonds and other choses in action, are assignable in equity.

In the case of Williamson *v.* Thomson, &c., 16 Ves. 443, it appears that David Thompson obtained from the East India Company, at their treasury in Bengal, certificates of deposit to entitle him to receive the money from the treasury of the company in England.  These certificates were indorsed by said David, and remitted, with other funds, to his brother, George Thompson, with instructions to effect insurance on account of David on the property he had taken on board the ship Earl of Dartmouth, on his homeward voyage to England.  Before the receipt of the letters in England said George became a bank-

rupt. The ship Earl of Dartmouth was lost; David escaped, but died on board another ship, having previously published his will, appointing his brothers, George and William Thompson, executors, who obtained probate. The assignees of the bankrupt, George, got possession at the India house of all the letters addressed to said George Thompson, effected insurances, &c., and having obtained from the executor, George, his indorsement of the East India Company certificates, received the money, claiming it as of the effects of the bankrupt, George Thompson. Lord Chancellor Eldon determined that the property of the said David Thompson did not pass at law by his indorsement of the India certificates; and the said George having become a bankrupt, and the assignees having possessed themselves of all the papers, and there being no evidence of any specific appropriation by said David of these certificates, they did not pass in law or equity by the indorsement, but remained of the property and estate of the said David Thompson.

The decision in the case of Glyn v. Baker, 13 East, 509, was, that an India bond was not assignable. This was before the statute of 51 George III., ch. 64, which makes them assignable, and enables the assignee to sue in his own name. "A bare indorsement of a name transfers no property, and therefore, where the plaintiff produced the note with his own name indorsed, Lee, Chief Justice, suffered him to strike it out." Bull. N. P. 275.

The case of Irvine v. Lowry, 14 Peters, 298, 299, arose upon a note payable to Guy C. Irvine in bank notes, and indorsed with the name of Guy C. Irvine in blank.

This court decided that the paper was not negotiable, either by the usage and custom of merchants, the statute of Anne, or the kindred act of Pennsylvania. "It is not negotiable by indorsement, and not being under seal, it is not assignable by the act of Assembly on that subject relating to bonds. The bank, therefore, cannot sue in their name in virtue of the indorsement of Irvine in blank; nor could they sue if it was specially indorsed to them, because the legal right of action would still remain in Irvine, though the equitable right in the thing promised may have passed to the bank."

This decision is clear and conclusive to show that the mere indorsement of the name of Baldwin upon these certificates did not divest Baldwin of his legal right; and if any person other than Baldwin claims a right or interest in these certificates, it can only be an equitable right, growing out of a contract for a transfer founded upon valuable consideration paid to Baldwin

for his property therein, sufficient to raise a trust and use in equity in favor of such assignee.

That the assignee of a paper not negotiable according to the law merchant, nor made by statute negotiable in like manner as bills of exchange, cannot claim the privileges, remedies, and protection accorded to indorsees by the law merchant, but takes such paper at his peril, subject to all equities and infirmities of title, will appear by these decisions in the courts of law and equity. Wheeler v. Hughes, 1 Dallas, 27, 28 ; McCullogh v. Houston, 1 Dall. 443, 444 ; Drake v. Johnson, Hardin, 223 ; Mandeville v. Riddle, 1 Cranch, 298 ; Jenny v. Herle, 1 Strange, 591 ; Banbury v. Lissett, 2 Strange, 1212 ; Peters v. Soame and Greene, 2 Vern. 428 ; Coles v. Jones and another, 2 Vern. 692 ; Turton v. Benson and others, 2 Vern. 765. The cases of Williamson v. Thomson, 16 Ves. 443, decided by Lord Eldon, of Theed v. Lovel, Bull. N. P. 275, by Chief Justice Lee, and of Irvine v. Lowry, 14 Peters, 298, 299, by the Supreme Court of the United States, are insurmountable authorities establishing the principle " that the bare indorsement of a name transfers no property " ; that the mere indorsement of John Baldwin's name in blank on these certificates did not divest him of his property in them, and transfer his right to another person.

An assignment of these certificates could be effected only by a contract, by an agreement to which John Baldwin was a party assenting, — by an agreement between him and another person or other persons, by which they formed an engagement between them, the owner, John Baldwin, assenting, upon valuable or good consideration to transfer his property in these certificates, and the other party assenting to accept the transfer and pay the consideration. An assignment so made would have been binding in equity ; but a court of equity does not sanction a *nudum pactum* any more than a court of law.

The indorsement of his name upon these certificates issued to John Baldwin did not include a lawful right, a legal authority, to any finder or purloiner to write over that name whatsoever he pleased, and to transfer the property of John Baldwin thereby. An authority to transfer can be derived only from the assent of John Baldwin, signified lawfully and in some better manner than the simple production of his name indorsed in blank, without proof of any thing or circumstance, other than his name

Men write their names upon blank leaves in their books to identify their rights of property in those books. As there are different men having the same names, — as, for example, several men named John Rogers, or John Scott, or John Smith, or

John Anderson, or John Baldwin, — the name of the original proprietor, written by his own hand, may be of use in questions of property and identity of the owners between persons of the same name, or their representatives, because men are distinguished by their handwriting as well as by their faces; for it is very seldom that the shape of their letters agrees any more than the shape of their bodies. But it would be absurd to say, that a person who obtained possession, by finding or by purloining, of a book with the name of the owner written in blank on a blank leaf, thereby acquired an authority to write over the name a. transfer of the right of property. And it would be ridiculously absurd to suppose, that, if a person cut such leaf out of a book, he, or any other person to whom he might deliver, thereby acquired a lawful right or authority to write over the name an assignment of a chose in action, or a bill of sale of a horse, or other property belonging to the person who had so written his name.

The bare writing of a name, — the bare indorsement of a name, — gives no authority, transfers no property, except only in certain peculiar privileged cases, ruled and governed by the law merchant; which is not applicable to these.

Chief Justice Holt said, the merchants of Lombard Street could not make or unmake the law, and as often as they came into court upon promissory notes before the statute of Anne, declaring on them as bills of exchange, he nonsuited them. The brokers of Wall Street can no more transmute these certificates into bills of exchange, than the merchants of Lombard Street could convert promissory notes into bills of exchange.

*Mr. Bradley*, for the appellee, contended, —

I. That Gardiner was a competent witness. (That part of his argument is omitted.)

VI. But suppose we have failed to show that Gardiner is a competent witness, how stands the case then? We have the bill, answer, and depositions of Bolton and Riggs. By the former it is averred, and by the answer it is admitted, that these papers were once the property of Baldwin, and that he indorsed them; and the proof shows, that, with his indorsement, in the month of December, 1842, when they were worth only 25 per cent., they came in open market to the possession of Elisha Riggs, in New York, and were retained by him, or his agents, till the month of June, 1843. The complainant says they were stolen or lost. How, when, where, or by whom he does not suggest, but he did not discover the loss till February, 1843, and then gave notice at the Department, and that is all; and

he says they are now in the possession of the defendant, that he is remediless, save in this court, " to obtain a discovery of the right and title which said Ely possesses, or under which he claims, and that said certificates may be delivered up to your orator as obtained from him by fraud' or theft ; and he prays that said Ely may be required to prove and show how the said certificates were procured from your orator, and for what consideration, and when and ,where."

The case, then, is that of a man who puts his name on the back of a paper containing an obligation to pay money to himself, and which paper he seeks to recover from a third person who is holding and claiming it. He avers that it was lost or stolen, and he seeks to discover from the holder, and calls upon him to show and prove how, and for what consideration, and when and where, he became possessed of it.

The first question which naturally presents itself is, On whom is the burden of proof in the first instance ?

It is said the paper is not negotiable, and possession does not import ownership. If the cases already cited are authority, it is evident that any person taking *bonâ fide* for a valuable consideration, and without notice, the papers thus indorsed, would thereby acquire a title to them. It may be true, that they stood on 'the same footing as promissory notes prior to the statute of 3 & 4 Anne, by which they were first made negotiable ; but it has not been doubted for many years that the assignee of a chose in action has title to it. It is also an admitted principle in regard to such instruments, that, with the indorsement of the payee upon them, the title passes by delivery, if they were delivered with that intent ; and it has been expressly ruled, that .the holder would have a right to fill up the indorsement to himself. The difference, and the only essential difference, is, that the statute and the law merchant operating upon negotiable paper pass the legal title by indorsement and delivery, and dispense with proof of the consideration between the original parties for which it was passed. There is, then, nothing on the face of the papers to put the party on his guard, but every thing to show that Baldwin had parted with them voluntarily. ·

He avers that they were lost or stolen ; but as to the time, place, or circumstances of their disappearance, he is silent. He professes to have discovered the loss in February, 1843 ; yet it is clear, by his own proof, that they were out of his possession as early as the December previous. He had indorsed them ; but for what purpose, or when, he cannot say. In his bill, he says (p. 3), " Immediately on discovering the said abstraction,

he notified the Treasury Department, by letter dated 12th February, 1843," and in his affidavit he says (p. 57), that " some time in the year 1842 there was lost, mislaid, or purloined from my possession, three certificates of the Treasury of the United States for Mexican indemnity, numbered as follows, viz. 989, 990, 991, which were advertised in the Madisonian for six consecutive weeks during the months of May and June, 1843," &c.  These are all the facts stated and relied on as evidence of notice.

Not a tittle of proof is afforded by him of these pretended facts.  They are not admitted in the answer.  He was therefore bound to prove them, if they are at all material to his case.

The answer denies, in the most explicit terms, the fact of the loss.  He was, therefore, bound to prove it, more especially if, by his indorsement, he authorized a *bonâ fide* holder to write an assignment over it.  Clarke's Ex. *v.* Van Riemsdyk, 9 Cranch, 153; Hughes *v.* Blake, 6 Wheat. 453; Carpenter *v.* Providence Insurance Company, 4 Howard, 185; Young *v.* Grundy, 6 Cranch, 51.

The answer admits that the papers once belonged to the complainant, but that does not dispense with his proving that he lost them.  It is not matter in avoidance.  The papers themselves, being indorsed by the complainant, and in the possession of a third party, are *primâ facie* evidence of his having parted with them voluntarily, and the answer insists he did so part with them.  This, after any proof of the loss, would be matter in avoidance, but not without such proof.  It would be the same in the case of a negotiable instrument.  The answer must admit that the note was delivered to the party to whom it was payable, and by whom it was indorsed.  His indorsement and delivery in the one case imports a consideration; in the other, it leaves open the question of consideration, as between the original parties to the paper, but it does not admit any thing more; it does not admit that it was lost or stolen, or parted with by the payee without consideration.

However that may be, the answer in this case is explicit, denies the loss set up by the complainant, and puts him to the proof.  This is the gist of the whole matter, and the complainant having failed in this, his bill must be dismissed.

VII. But it is said these certificates, like those in the case of Williamson *v.* Thomson, 16 Ves. 443, are not assignable at law, and did not pass in law or equity, by the indorsement, but remained the property of Baldwin, as those did of Thompson. It is sufficient to say of that case, — 1st. That it does not es-

50 *

tablish the principle for which it is cited ; 2d. It was decided on its peculiar facts. The substance is, that David Thompson, the owner and holder, indorsed them and forwarded them in letters to his brother George, who was his general agent in England, and died. George became bankrupt, and the assignees took possession of all his effects, among others, of the letters accompanying these certificates, and the certificates themselves, procured the indorsement of George upon them, and received the money. The representatives of David claimed them, and proved these facts. The assignees did not produce the letters; and relied on the indorsement. The master found that, by reason of the assignees' taking possession of these letters, &c., it could not be ascertained whether the sums payable by the said certificates and bill were appropriated, or intended to be appropriated, to any particular purpose, &c. (p. 447.) And the court say, " Unless the legal effect of the circumstances stated by the trustees' report is, that these certificates became the property of the bankrupt, this court is called upon to make this declaration, upon the intention to appropriate them, and whether the act of the assignees, or, as is much more probable, the act of the bankrupt himself, has prevented the court seeing what was the appropriation intended, every thing is to be inferred that can be inferred against them." This case, then, does not touch the principle, that, without other circumstances, the possession of an assignable instrument indorsed by the assignee is *primâ facie* evidence that he has voluntarily parted with it.

The case of Irvine v. Lowry, 14 Pet. 298, does no more than affirm the principle, that a suit at law to recover a chose in action must be in the name of the payee or obligee, in whom the legal title still remains, unless there be an enabling statute changing the common law, while it affirms the proposition that the bond, bill, or note passes by indorsement and delivery. The other cases relied on in the argument go no further, unless it be to show that the assignee of a chose in action takes it subject to the equities subsisting between the original parties.

But it is said the " assignment could be effected only by a contract, by an agreement to which Baldwin was a party assenting, . . . . . upon a valuable consideration, to transfer his property in these certificates, and the other party assenting to accept the transfer and pay the consideration." And it is admitted, that " an assignment so made would have been binding in equity." This is conceding the whole question, and retracting all that precedes it. We are in equity. It is a question of evidence. The bare indorsement of negotiable paper does

not transfer the title. It must be accompanied or followed by delivery. So of a chose in action, the fullest words of assignment do not transfer the title. There must be a delivery. In the former case, the negotiable paper, possession is evidence of delivery. In the latter case, the possession by the assignee is as strong *primâ facie* evidence. But, if the indorsement of his name by the payee, and a delivery to a third person, will authorize that person to fill up the assignment in the name of the payee, and thus as effectually transfer the title as if it were first filled up by the assignee before delivery, can there be a question that the possession of such a paper, with a blank indorsement, is *primâ facie* evidence of delivery ?

The questions are, What is the form of an assignment, and how must it be evidenced? There is no precise form. It may be by delivery. Briggs *v.* Dorr, 19 Johns. 96, citing numerous cases; Onion *v.* Paul, 1 Har. & Johns. 114; Dunn *v.* Snell, 15 Mass. 485 ; Titcomb *v.* Thomas, 5 Greenl. 282. True, it is said it must be on a valuable consideration, with intent to transfer it. But these last are requisites in all assignments, or transfers of securities, negotiable or not. It may be by writing under seal, by writing without seal, by oral declarations, accompanied in all cases by delivery, and on a just consideration. The evidence may be by proof of handwriting and proof of possession. It may be proved by proving the signature of the payee or obligee on the back, and possession by a third person. 3 Gill & Johns. 218.

It is a question of authority, the authority dependent on the act and intent. When a man delivers to another a blank piece of paper, of convenient and proper size for a promissory note, with his name signed in that part where the signature to a promissory note ordinarily appears, and the holder fills it up with a promise to himself, the authority to do so is immediately implied from these acts. When he writes his name across the middle of such a piece of paper, and the holder writes a promissory note, payable to him or order, on the other side, the fair presumption is, that he intended this as the consequence of his act.

It is a question of delivery ; he is the holder of these certificates. He assigns no reason for, or time, place, or circumstance of or attending his doing so, but he indorses these three certificates. Why indorse these three ? Where was he when he indorsed them? Where did he keep them? When did he lose them ? Where ? Who saw them ? Can he afford no clew to trace how, when, where, under what circumstances, all or any of these things occurred ? And what steps did he take ? He tells

us at one time, that immediately on discovering his loss he gave notice at the Department. Then he took advice of counsel. Could he not prove these facts? But what else? In his affidavit he says they were stolen in the year 1842, and he advertised them in May and June, 1843, six months after their loss, and three months after his discovery of that loss. Are these the acts, is this the conduct, of a man who has really sustained a loss of three thousand dollars? Yet even of this he gives no proof. Did he lose them? He has failed to prove a fact or circumstance from which the loss can be inferred; they are in the possession of a third party. Must he not have delivered them?

But if we err in supposing the burden of proof is on him to show the loss, or that he has in fact made a *primâ facie* case of loss, and if we are wrong in supposing the indorsements made by him are *primâ facie* evidence of his having voluntarily parted with them, and cannot now reclaim them, we say, —

Finally, this is a bill for discovery and relief. The complainant was not satisfied with setting up his loss, but he calls for a discovery of the right and title which said Ely possesses, or under which he claims! So far as this discovery is made through the answer, the answer is responsive to the bill, and is evidence of the facts stated in it. This, therefore, makes evidence all that part of the answer which states the transactions between the defendant and Gardiner. It is, then, clear that the defendant became the holder of the certificates indorsed by complainant. *bonâ fide*, without notice, on a just consideration, as the property of Gardiner. The complainant himself has proved that Elisha Riggs bought them from Perkins Nicholls, a broker in the city of New York, and sent them to the house of Corcoran & Riggs; and further, in his bill he sets up that they will be paid at the Treasury Department on the 5th of February, unless restrained by the injunction of the court. He has therefore clearly shown, not only that they passed by delivery among brokers and others, but that the holder with this indorsement upon them was recognized at the Treasury Department as owner. Mr. Ely, then, acted but as other prudent men would have acted, in giving credit to this indorsement. Here the complainant himself has recognized its force by stopping the payment. It follows that, by his voluntary indorsement and his negligence, the defendant has been induced to part with his money. But for those indorsements, Gardiner could not have obtained the money; and but for the want of care of Baldwin in preserving his papers, Gardiner could not have presented them to Ely. *Volenti non fit injuria.* That

he knew the consequences of his indorsement if he passed the papers is apparent from his whole conduct. It would otherwise have been but a snare for the most wary. He now comes into a court of equity to be relieved from the consequences of his own negligence. Can he have relief until he does equity? Was not the court below bound to dismiss his bill unless he offered to redeem a mortgage thus created by his want of care?

I have avoided any discussion of much that is relied on on the other side, thinking that a general summary may suffice to correct some of the most material errors of fact and erroneous deductions which are apparent in the argument.

Mr. Ely states that he made his first advance in April, 1842, upon three certificates, the numbers of which he does not recollect, and afterwards made further advances on promises of additional security. On the 13th of August, 1842, Gardiner deposited with him three other certificates, and received further advances to the 16th of December, 1842, when the whole sum was $2,077; that some time in or about that month Gardiner called and represented to him that the certificates had become much more valuable in consequence of the arrangements then recently perfected between the United States and Mexico, and requested him to let him withdraw three of the six he had deposited. He does not state, as is supposed in the argument for complainant, that such arrangements had been made, but that Gardiner told him so. Gardiner may have stated what was not the fact, but that does not affect Mr. Ely. He further says, that, some time after that, Gardiner again applied to him to exchange them — that is, the three which he had thus received from Ely — for those then held by Ely, and he, knowing no difference, assented to it, made the exchange, and the three he then received are those now in controversy. It is, then, evident that he had these three certificates as early as April, 1842, or certainly as early as the 13th of August, 1842. Yet Baldwin does not discover the loss, according to his statement, till February, 1843. There is, then, in all this nothing in the remotest degree to raise a doubt of the entire fairness of Mr. Ely in the matter. It is said that Riggs and Bolton prove this last exchange to have been made as late as the 14th of June, 1843, and after the certificates had been advertised as stolen. But we have already shown there is not a particle of proof in the cause of any such advertisement, or other notice, having at any time been given by Baldwin. There is nothing from which it can be inferred that Ely had any ground to suspect the title; they were the same certificates he had held nearly a year before. and the very papers indorsed by the complainant on

which he had lent the money, which has not been repaid to him to this day.

Mr. Chief Justice TANEY delivered the opinion of the court.

This case is brought here by appeal from the decision of the Circuit Court for the District of Columbia for the County of Washington, sitting as a court of chancery.

The appellant filed his bill in that court, stating that large sums of money were awarded to him under the convention with Mexico, for which he obtained certificates, payable to him or his assigns, from the Treasury Department, according to the act of Congress of September 1, 1841. That among these certificates were three for one thousand dollars each, numbered 989, 990, and 991; that upon the back of these certificates, among others, he wrote his name, but without any words of transfer or assignment, and continued to hold them as the lawful owner; and that while he thus held them, the said three certificates were either casually lost by him, or, as he verily believed, purloined or stolen. He states further, that upon discovering their loss he gave notice of it to the Secretary of the Treasury, who agreed to suspend payment in case they should be presented, until an opportunity should be afforded him to regain possession of them, or to assert his right by some legal proceeding, but that he had been unable to discover where these certificates were, or who held them, until a short time before the bill was filed, when he received notice from the Department, that they had been presented for payment on behalf of the appellee, and would be paid accordingly, unless sufficient grounds for refusing should be furnished by the appellant; and that as the appellee resided out of the District of Columbia, and his agent was a member of Congress, and therefore not liable to arrest, he was without remedy except by the aid of the court to obtain a discovery of the right and title which Ely, the appellee, possessed, or under which he claimed; and prayed that he might be required to prove and show how the certificates were procured from the appellant, and for what consideration, and when and where, and to produce them before the court, and be compelled by its decree to deliver them to the complainant.

The appellee appeared and put in his answer, in which he states that these certificates, indorsed in blank by the appellant, were delivered to him by a certain Perry G. Gardiner, to be held as security for loans and advances previously made by the appellee to the said Gardiner, and also for such further loans and advances as he might thereafter make. He further states, that he afterwards made sundry advances, which he particularly

mentions, and that he has altogether advanced to Gardiner two thousand and seventy-seven dollars, for which he holds these certificates. He further states, that, at the time he took them, he believed, from Gardiner's representations, that he was the owner, and had no knowledge or suspicion of any circumstance that could invalidate his title. And further, that he is informed, and believes, and charges, that they were indorsed with the express intention of passing by such indorsement a perfect title to Gardiner, and handed by the appellant to him, that he might go into the market and negotiate them, and apply the proceeds in payment of a debt due from Baldwin to him.

The transactions between the appellee and Gardiner are set out in the answer much more particularly and in detail than is here stated, and a great portion of it is taken up in stating a transaction between him and Gardiner concerning a pledge of other certificates, upon which a large portion of the advances now due were originally made, and explaining how these three certificates became finally pledged for the whole amount loaned by the respondent, and the others released. But it is unnecessary to state these particulars here, because we see nothing in the case to impeach the fairness and good faith of the appellee, and the summary above given is sufficient to show the issues upon which this controversy must be decided.

Gardiner was examined as a witness on the part of the appellee, and sustains in every respect the statement in the answer. But his testimony is objected to by the appellant, first, upon the ground that he is interested, and therefore incompetent; and secondly, that if he is competent he is not worthy of credit. It is not necessary to express an opinion upon the validity of either of these objections, for the admission or rejection of his testimony would not change the equity of the case.

Putting aside, therefore, the testimony of Gardiner, it appears from the bill and answer that the appellee is in possession of these certificates, claiming title to them as assignee. The act of Congress directs that such certificates shall be made payable to the person entitled under the award of the commissioners, his legal representatives or assigns, and the certificates in question were issued in conformity to the law, and made payable to the party, his legal representatives or assigns, upon the surrender of the certificates at the Department. They are therefore legally transferable by assignment, and no particular form of assignment is prescribed. The certificates in question were indorsed in blank by the appellant, and that indorsement would be altogether useless and unmeaning, unless made for the purpose of transferring the property to an assignee, and authorizing

any person entitled to it in that character to write over his name a formal and regular assignment, if it should become necessary, or he should deem it his interest to do so. The holders of certificates of this description, thus indorsed in blank, have always been recognized at the Treasury Department as assignees, without any formal assignment, and the money due on the certificate paid to them, except only when doubts were entertained of the genuineness of the indorsement, or notice given that the title of the holder was disputed. Neither the law nor the usages of the Department require that the indorsement or assignment should be attested by a witness.

There is nothing, therefore, in the form and character of the indorsement calculated to awaken suspicion that the appellee had obtained them unfairly. The handwriting of the appellant is admitted, and the indorsement is according to the usage sanctioned by the Department at which they are to be paid. His possession, therefore, upon established principles of law, is *primâ facie* evidence that he is entitled to the property until the contrary appears. A different rule would put in jeopardy the title to a great portion of this scrip, which has been fairly purchased for a valuable consideration. For it has been a common article of traffic, and much of it has passed through a variety of hands, with no other evidence of an assignment to the holder but the indorsement in blank of the original payee. We do not mean to say that these certificates are to be regarded as commercial instruments, to be regulated by the commercial law, and that the holder is entitled to all the rights which belong to a *bonâ fide* indorsee of a promissory note. He certainly is not. They are, however, property, and the legal right to them may, under the act of Congress, be transferred to another, like the right to any other property. And the possession of them by the appellee, with the customary form of assignment indorsed upon them, in the handwriting of the party to whom they were originally issued, entitles him to the benefit of the legal presumptions in favor of his right which always arise from possession, until proof is offered to the contrary.

Now the appellant offers no proof that the certificates were lost or stolen, as charged in his bill, nor any proof that they remained in his possession after he indorsed them, nor any evidence that the indorsement was made for any other purpose than that which it imports; that is, for the purpose of transferring it to another person.

It is true, that it appears from the testimony of witnesses to whom there can be no objection, that these certificates were advertised by the appellant, as having been improperly obtained

from him, and that his advertisement appeared in some news-paper before they were pledged the second time to Ely. But the advertisement is no evidence of the fact stated in it, and there is no reason to believe that it came to the knowledge of the appellee before the last transaction between him and Gardiner. And if Gardiner's testimony is rejected, there is no evidence in the case to support the allegations in the appellant's bill, nor any ground upon which he can entitle himself to the relief he asks for.

Besides, the object of the appellant's bill is for discovery as well as relief, and to obtain from the appellee a discovery of the right and title which he possesses, or under which he claims. The answer, therefore, is responsive to the bill, when it states the transactions with Gardiner, and the circumstances under which he received the certificates, and the advances he made upon them. And it is entitled to all the weight which the rules of equity give to an answer when it is responsive to the bill, and speaks of facts within the personal knowledge of the respondent.

The case of Williamson v. Thomson, 16 Ves. 442, relied on by the appellant, depended on different principles. The East India certificate in dispute in that case was not by law assignable, and the order indorsed upon it by the party to whom it was issued, to pay the amount to another, did not transfer the legal right to the money. It might pass the equitable title, if so intended, but nothing more. The decision turned upon the meaning and intention of the indorsement. The Court of Chancery was called upon to expound it, and to determine, from the evidence, whether it was intended as a transfer of the equitable right, or as an authority merely to receive the money as the agent of the original payee, and for his use. The court determined that he took it in the latter character, but upon evidence which presented a case altogether unlike the one now before us.

The decree of the Circuit Court dismissing the bill cannot, however, be sustained. The appellee admits that he did not purchase the certificates from Gardiner, but took them as security for the money loaned. Consequently, the appellant is entitled to redeem, upon payment of the advances stated in the answer, with interest upon the several sums from the time they were respectively loaned. The decree of the court below must therefore be reversed, with the costs in this court, and the case remanded, with directions to cause an account to be stated in conformity to this opinion, and to pass a decree requiring the certificates to be delivered to the appellant, upon his pay-

Hogan et al. *v.* Ross.

ing or tendering to the appellee the amount found to be due, and in case the money is not paid or tendered by a day to be fixed by the Circuit Court, then the certificates to be sold, and the proceeds apportioned between the parties in the manner herein directed.

In taking the account, the appellee is to be allowed the whole amount of the loans and advances to Gardiner, for which these three certificates were ultimately left in pledge. And as the appellant did not offer to redeem them, and insisted on their absolute re-delivery to him, the court think that, under the circumstances as they appear in the record, the appellee is equitably entitled to his costs in the Circuit Court, and they are accordingly in the account to be charged against the appellant. But as regards the costs in this court, the appellant, by the established rules and practice of the court, is entitled to recover them, and they must be charged against the appellee.

A mandate will be issued to the Circuit Court in conformity with this opinion.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Columbia, holden in and for the County of Washington, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby, reversed, with costs for the appellant in this court, and that this cause be, and the same is hereby, remanded to the said Circuit Court, with directions to that court to proceed therein in conformity to the opinion of this court, and as to law and justice shall appertain.