## BRASS *vs.* WORTH & WHITE.

The plaintiff entered into an arrangement with the defendants, for the employment of the latter in their business of stock brokers; the defendants undertaking to purchase such stocks as the plaintiff should direct, and pay for the same with their own moneys, and to hold such stocks for him, and resell the same from time to time, as he should direct. For these advances and services they were to receive a fixed rate of interest, and a commission; and as security against depreciation and loss, the plaintiff was to deposit and keep on deposit with them a margin of five per cent upon the par value of all purchases of stock made by them for him, which margin was constantly to be kept good.

*Held* that although prices sank so low that the collaterals deposited were no longer equal to the margin of five per cent stipulated in the contract, the defendants had no right to sell, at the board of brokers, the stocks pledged to them by the plaintiff for their security, without notice to, or knowledge of, the plaintiff.

*Held*, also, that the notice which should have been given by the defendants was not a notice to redeem, but a notice to make the security deposited equal to the five per cent stipulated in the contract, or that the defendants would proceed to sell and convert the stock into money, and apply the proceeds to reimburse themselves for the moneys advanced, with the interest and commissions.

A sale of stocks at the board of brokers is not to be deemed a public sale, but is essentially a private sale; and a sale of collaterals held by the pledgees thus made, without notice, is a clear violation of the duty and obligation they owe the pledgor.

Acquiescence by a principal, in the wrongful acts of his agent, to amount to a ratification, must have been continued for some length of time, and the principal must have been cognizant of his rights.

In order to make the ratification of an unauthorized act of an agent binding it must be made with a full knowledge of the facts affecting the rights of the principal.

Rule of damages, in an action by a principal against his brokers for unlawfully selling stocks deposited with them as collateral security for advances, &c.

Brass *v.* Worth.

APPEAL by the defendants from a judgment entered upon the report of a referee.

*J. Neilson,* for the plaintiff.

*Wheeler & Armstrong,* for the defendants.

*By the Court,* BROWN, J. The referee found as a conclusion of law, in this action, that the relations of the defendants to the plaintiff were not those of mere agents or brokers, but they were contractors, owing duties and obligations to him which they were bound to perform and fulfill. Brokers they certainly were, for that was their business and occupation, and agents in some sense, because under certain conditions and limitations they were to act for and execute the will of the plaintiff. But in addition to all this, under the contract referred to in the pleadings and proofs they had incurred obligations, and bound themselves to do things beyond that of mere agents existing at the pleasure and bound to execute the commands of their principal. In this legal conclusion of the referee I concur; for to construe the contract in such a way as to bring it within the rules which regulate the relation of principal and agent, would result in injury to the plaintiff and disregard the manifest intention and object of the parties to the contract.

The defendants are stock brokers and dealers in the purchase and sale of stocks for other persons, upon commission, and the plaintiff, at the time of the making of the contract, was desirous to purchase stocks, not for investment but for speculation as merchandise, and to be resold again from time to time, for a profit and increase to himself. The proof showed, and so the referee found, that on the 11th October, 1861, the plaintiff and the defendants entered into an agreement for the employment of the defendants in their buisiness of stock brokers, the defendants undertaking to purchase such stocks as the plaintiff should direct, and pay for the

same with their own moneys. They were also to hold such stocks for the plaintiff and resell the same from time to time as he should direct. For these advances and services they were to be secured and compensated in manner following. They were to charge the plaintiff a commission of one-eighth of one per cent upon the par value of the purchases and the sales, and interest at the rate of seven per cent upon all moneys disbursed by them in such purchases, and the plaintiff was to deposit and keep on deposit with them for their security against depreciation and loss a margin, as it is termed in technical language, of five per cent upon the par value of all purchases of stock made by them for him and under his direction, which margin was constantly to be kept good; by which I understand the plaintiff was to have on deposit with the defendants other stocks or securities equal in value, at all times, to five per cent upon the par value of the stock purchased by the defendants and held by them for the plaintiff, under the contract. The effect of this arrangement is obvious. The defendants were to purchase the stock with their own moneys. They were to receive a fixed rate of interest therefor, and a fixed commission as a compensation for their services. It results from the presence of these stipulations in the contract, (the payment of interest upon the purchase money and a compensation for the purchase and sale of the stocks,) that the plaintiff was the owner of the property, having the title thereto subject to the lien of the defendants for moneys disbursed in the purchase and for commissions. As security against depreciation and loss, they held the stocks purchased, with the collaterals, equal to five per cent upon the par value of the purchases made by them. They were to buy and sell under the direction of the plaintiff, who took all the hazard, all the profits, and sustained all the losses if any. In one essential particular the contract was silent. It did not prescribe with certainty and precision the rights and duties of the defendants in the event of the value of the deposited collaterals falling below the prescribed five per cent,

Brass *v.* Worth.

upon the par value of the purchases made and held by them for the plaintiff. But if I am right in thinking that the defendants are to be regarded as the pledgees of the plaintiff, of both the stocks purchased and those deposited as security for the moneys advanced, together with the interest and commissions, then whenever the contingency referred to happened, and the plaintiff failed to fulfill the contract on his part, the law defined as well the duties as the rights of the pledgees in respect to the subjects of the pledge.

On the 18th December, 1862, the defendants, under the agreement, held for the plaintiff 300 shares of stock which had been paid for and carried by them, to wit, 100 shares of stock of the Erie Rail Road Company, 100 shares of the stock of the Michigan Central Rail Road Company, and 100 shares of the stock of the Rock Island Rail Road Company, the purchased price whereof amounted to the sum of $13,975. They also, at that time, held 500 shares of the stock known as the common stock of the New York and Harlem Rail Road Company, deposited with them as margin or collateral security ; such deposit having been made from time to time voluntarily as the purchases increased. On the day above referred to and for a few days prior thereto, there was a decline in the price of stocks, and the market value of the 300 shares purchased for the plaintiff by the defendants had fallen, so that on the 18th day of December the margin on the sum was not kept good but became exhausted. On the same day the defendants, who were members of the board of brokers, claimed and asserted their right to sell, and did sell, the 300 shares of stock at the board of brokers in the city of New York, on the plaintiff's account, in the manner in which sales of stock are usually sold at said board, without stating the sale to be on his account, and without notice to him, or knowledge by him of such sale, and without requiring him to make good the security and deposit a further margin. On the 20th December, 1861, the defendants, without notice to or demand upon the plaintiff, also sold 200 shares of the common stock of the

New York and Harlem Rail Road, at the board of brokers, in the same manner as they sold the other stock. In like manner, and on the 30th December, they sold another 100 shares of the same stock, and on the 6th January thereafter they also sold the remaining 200 shares of the same stock in the same manner. Before this last sale, and on the 2d of January, 1862, the plaintiff gave the defendants notice not to sell the New York and Harlem Rail Road stocks.

The characteristic of the stock market is uncertainty and instability. Prices fluctuate from day to day, caused by events which cannot be foreseen, and influences which few can estimate. Prominent among these are combinations amongst brokers and dealers themselves, by which prices are depressed or enhanced, to the detriment and ruin oftentimes of outside holders. This uncertainty and instability, this sudden rise and fall in prices, which constitute the inducement and the danger of stock dealing, should not be lost sight of in putting a construction upon the contract under consideration. We are to look at the object the parties intended to accomplish, as well as the nature of the business in which they were engaged, in connection with what was said and done at the time the contract was completed. The defendants claim the right to sell the property pledged, without notice to or the knowledge of the pledgor, the moment prices sink so that the collaterals deposited are no longer equal to the margin of the five per cent stipulated in the contract. The nature of the business is so instable and precarious that this contingency may happen at any moment, from causes over which neither the pledgor nor any other person has any control; but whenever it does happen the defendants claim a right, without a moment's notice, or an opportunity afforded the owner of the stock to make the security equal to the stipulation in the contract, to sell the property pledged at the brokers' board, at such price as any member present may choose to give, whatever may be the sacrifice and injury to the owner of the stock pledged. Such a construction of the

contract is utterly subversive of the objects which the parties had in view when it was made, and destructive of the rights and interests of the plaintiff. It places him in a position of entire helplessness, and takes away his property before he is aware that the margin is insufficient, and before he is in any default for omitting to make and maintain the security equal to the stipulations of his agreement.

In *Wheeler* v. *Newbould*, (16 *N. Y. Rep.* 392,) the property pledged as security for the payment of the debt was fourteen promissory notes not due at the time they were pledged. After the debt became due the money was demanded and the pledgee proceeded to sell the subject of the pledge, at private sale, without notice of the time and place, to the pledgor. The court held that to authorize a sale of the subject of the pledge by the act of the party, without judicial proceedings, personal notice to redeem and of the time and place of the intended sale, which must be public, must be given to the pledgor. The court also recognize the principle (2 *Kent's Com.* 581) that the pledgee is trustee for the pledgor, first to pay the debt, and second to pay over the surplus, and that he cannot so deal with the trust property as to destroy or even impair its value. The pledgee may sell " without any such judicial sanction, after giving the proper notice of the intended sale as prescribed by law." (2 *Story's Eq. Juris.* 1008.) " The creditor may sell without judicial process, upon giving reasonable notice to the debtor to redeem, but the creditor will be held at his peril to deal fairly and justly with the pledge, both as to the time of the notice and the manner of the sale." (2 *Kent's Com.* 582, 583.) The notice to be given by the defendants in this case was not a notice to redeem, but a notice to make the security deposited equal to the five per cent stipulated in the contract or the defendants would proceed to sell and convert the stock into money and apply the proceeds to reimburse themselves for the moneys advanced, with the interest and commissions. The sale which the defendants made of the plaintiff's stocks was

not public. It was essentially private. The board of brokers is an association of dealers in stocks, and is not open to the public. None but members are allowed to be present at the meetings, except upon invitation. When the stock was offered and sold it was not stated whose stock it was, nor was the purpose of the sale mentioned or intimated at the time.

The defendant White, in his testimony, describes the manner of the sale in this wise: "When the stock is called the buyers and sellers make their offers orally. I offered this orally. I either said I will sell one hundred shares of Erie at such a price, mentioning it, or closed with an offer by saying sold. The same course was pursued as to the remaining two hundred shares." This was not dealing fairly and justly with the property, and was, in my judgment, a clear violation of the duty and obligation of the defendants under the contract.

The defendants claim, as a separate ground of defense, that there was a ratification and confirmation of their action in regard to the sale and disposition of the three hundred shares of stock, and that such ratification is to be implied from the plaintiff's acquiescence. If this was a case to which this rule of the law of principal and agent could apply, there was no such acquiescence in the wrongful acts of the defendants with a full knowledge of the facts from which a ratification can be implied. The acquiescence, to work such a result, must have continued for some length of time, and the party thus acquiescing must have been cognizant of his rights. (2 *Story's Eq. Juris.* 1097.) Ratification is an act with knowledge, and must be unequivocal in its character. (*Hays* v. *Stone*, 7 *Hill*, 128.) In order to make the ratification of an unauthorized act of an agent binding, it must be made with a full knowledge of the facts affecting the rights of the principal. The plaintiff was made acquainted with the sale on the 19th of December, and the referee finds he did not dissent from it, but he says he "cannot find that the expressions used in regard to the sale of the 18th of December

Brass *v.* Worth.

.gave an unqualified and full consent to the sale, though no objection was made to its legality." The referee does however find as fact, and so is the evidence, that at the interviews with the defendants, and at the time of writing the letters relied upon as evidence of his acquiescence, the plaintiff did not know that the sale had been made privately at the board of brokers, and conducted in the way spoken of by the defendant White, in his evidence. The letters referred to are severally of the date of the 19th, 20th and 23d of De.cember, 1861. I certainly see nothing in them from which I should infer that the plaintiff assented, or was satisfied, or intended to submit to the wrong which had been done to him. He does not disavow and dissent to the sale in express words, but the letters contain expressions of disappointment, pain and distress, I may almost say anguish, at the loss he had sustained and the impoverished condition to which the defendants' acts, as he thought, had reduced him. They are not the expressions and acts of a mind satisfied and inclined to acquiescence and submission. The plaintiff's action was commenced on the 27th of January, 1862, just forty days after the sale at the broker's board.

The referee allowed as damages the value of the five hundred shares of the New York and Harlem stock on the 8th of January, 1862, with the interest, that being the time when the plaintiff demanded the return of it, and also the difference between the market value of the three hundred shares on the 22d of January, being a reasonable time after the sale, and the cost price of the defendants' purchase thereof, with. the interest, after allowing to the defendants and deducting therefrom interest upon the cost of the stock purchased and carried by them from the date of the purchases, and the commissions specified in the contract.

This estimate of the damages we think correct, and the judgment should be affirmed.

[ORANGE GENERAL TERM, September 14, 1863. *Brown, Scrugham* and *Lott,* Justices.]