## M. M. HEDGES *v.* LEWIS BURKE *et al.*

### (*Nashville.* December Term, 1922.)

1. **BROKERS.** Client held entitled to recover from bank with which brokers pledged stock bought for client and paid for by latter.

   A bank lent money to brokers for use in a checking account to carry on business pursuant to an agreement that the brokers would not deal in stock except as agents for others. The brokers bought stock for a client through correspondents, and he paid therefor by a check to the brokers, which was deposited to their account. The correspondents sent a stock certificate indorsed in blank to the bank with draft on the brokers attached. The draft was paid by the brokers by a check on their account, which was sufficient to pay the check, and they then pledged the certificate with other stock to secure their note to the bank for a loan, and in so doing the bank was informed that the stock did not belong to the brokers. *Held*, that the brokers' client was entitled to recover from the bank the value of the stock which it had sold under the power given in the note. (*Post, pp.* 249-252.)

2. **BROKERS.** Client held to have the title to stock purchased for him.

   From the moment that a client paid for stock bought for him by his brokers, if not from the moment their correspondents purchased it in another city, the title vested in him, and, subject to a lien on it for the purchase price advanced by their correspondents, his title was absolute. (*Post, p.* 252.)

3. **ESTOPPEL.** Sale of personal property by one without authority ordinarily conveys no title to innocent purchaser.

   Ordinarily, one intrusted with the possession of personal property by the owner, but without authority to sell or dispose of it, cannot transfer title to it even to an innocent purchaser, who ocquires no better title than that of the seller, except where the owner has conferred on another the usual *indicia* of ownership, or has held him out as having ownership or the power of disposal,

he is estopped to deny the ownership or authority of the other as against an innocent purchaser from him for value. (*Post, pp.* 252, 253.)

4. **CORPORATIONS.** Bank accepting from brokers pledge of stock held put on notice that it did not belong to them.

An agreement between a bank and brokers borrowing money from it to do business, binding them not to buy stock for themselves but only for others, put the bank on notice that a client's stock pledged by them to secure a note to it did not belong to them, and it took the risk that they were authorized to pledge the stock as they did.

5. **BROKERS.** Only interest of broker acquired by his pledge of his client's stock for which he advanced purchase price.

Though a broker may to the extent of his interest make a valid pledge of a client's stock for which he has advanced the purchase price, the pledgee acquires only the interest of the broker. (*Post, pp.* 253, 254.)

6. **TROVER AND CONVERSION.** Measure of damages stated.

Ordinarily, in cases of conversion, the measure of damages is the market value of the property at the date of the conversion. (*Post, pp.* 254-266.)

7. **TROVER AND CONVERSION.** Measure of damages for conversion of shares of stock stated.

The measure of damages for conversion of shares of stock is the highest value of the stock between conversion and the expiration of a reasonable time within which the owner might have procured other like stock in the market. (*Post, pp.* 256-260.)

Cases cited and approved: Romaine v. Van Allen, 26 N. Y., 309; Markham v. Jaudon, 41 N. Y., 235; Baker v. Drake, 53 N. Y., 211; Starbuck v. Cortazzi, 2 Cr. Mees. & Rosc., 165; Owen v. Routh, 14 C. B., 327; Williams v. Archer, 5 Man. Gr. & Scott, 318; Archer v. Williams, 2 Car. & Kir., 26; Rand v. White Mountains R. R. Co., 40 N. H., 79; Brass v. Worth, 40 Barb., 648; Pinkerton v. Manchester R. R., 42 N. H., 424; Suydam v. Jenkins, 3 Sandford (N. Y.), 614; Gruman v. Smith, 81 N. Y., 25; Colt v. Owens, 90 N. Y.,

Hedges v. Burke.

368; Wright v. Bank of Metropolis, 110 N. Y., 237; Morris v. Wood, 35 S. W. 1013.

Cases cited and distinguished: Galigher v. Jones, 129 U. S., 193; Dimock v. United States National Bank, 55 N. J. Law, 296.

## FROM HAMILTON.

Appeal from the Chancery Court of Hamilton County.— HON. W. B. GARVIN, Chancellor.

WILLIAMS & FRIERSON, for appellant.

SIZER, CHAMBLISS & CHAMBLISS, for appellee.

MR. JUSTICE McKINNEY delivered the opinion of the Court.

The bill in this cause was filed by M. M. Hedges against Lewis Burke and J. Staley Greever, constituting the firm of Lewis Burke & Co., and the First National Bank of Chattanooga, to recover one hundred shares of stock in the Penn-Mex Fuel Company.

The opinion of the chancellor, as to the question of liability, accords with our views, and is therefore adopted as our opinion, and is as follows

"In this cause there has been a judgment *pro confesso* against the members of the firm of Lewis Burke & Co., and the controversy is now between complainant and the other defendant, the First National Bank.

"Lewis Burke & Co. were brokers in the city of Chattanooga, one branch of whose business was to purchase and sell corporate stock, and bonds for their customers upon

commission. In the conduct of such a business capital is required, and the capital needed by Lewis Burke & Co. was in large part supplied by the bank in the way of loans to them. This was done under an understanding and agreement between them and the bank that they would not themselves speculate, that is, would not buy stocks or bonds upon their own account. The bank understood, therefore, that any stock which they appeared to purchase was in fact purchased by them for the account of some customer of theirs.

"In the latter part of June or first part of July, 1921, complainant gave Burke & Co. an order to purchase one hundred shares of stock of the Penn-Mex Fuel Company, whenever the price reached $21 per share, and to take 'street' certificates therefor, that is, certificates indorsed in blank by the person to whom they had been issued. On July 25, 1921, Burke & Co. notified complainant by mail that his order had been executed and inclosed to him a statement of the amount to be paid by him, to-wit, $2,100, the price of the stock, $15 commission for the New York brokers, through whom they had made the purchase, and $7.50 commission for themselves, making a total of $2,122.-50. For this sum complainant, not waiting for the stock to be delivered to him, sent Burke & Co. his check the same day or the day after, and receipt thereof was acknowledged by them on July 27th. This check Burke & Co. deposited in the defendant bank to their credit upon their general account.

"Burke & Co. purchased the stock upon the New York market through their correspondents in that city, the brokerage firm of Post & Flagg. Post & Flagg were not informed for whose account Burke & Co. were purchasing

Hedges v. Burke.

the stock, if not for their own account.   The certificate of stock was a certificate which had been issued by the Penn-Mex Fuel Company to C. D: Halsey & Co., and assigned in blank by the latter.   The method adopted by Post & Flagg to deliver the certificate of stock and collect the purchase price was the method usually pursued in such cases, viz.   they drew a draft upon Burke & Co. for the price of the stock plus their commission, attached thereto the certificate of stock, and deposited the same in a New York bank to be forwarded to a bank in this city, in this instance the defendant bank, with instructions to deliver the certificates to Burke & Co. upon their paying the draft. The draft with the certificates of stock attached reached the defendant bank on August 1st or 2d, and Burke & Co. were notified.   Although Burke & Co. had received payment from complainant for the stock as above stated, they did not pay this draft when notified, nor until August 6th. Near the closing hour on the afternoon of the last-mentioned day, Lewis Burke, with a check of Burke & Co., drawn upon their account at the defendant bank, paid the draft at the window of the collection department of the bank, and received and took into his possession the said certificate of stock.   Soon thereafter on the same afternoon, just how soon does not clearly appear, he pledged said certificate with certain other stocks to the bank through its assistant cashier, J. R. Higgins, five windows away from the collection window, to secure a note of Burke & Co. then and there made for $5,500 due at two days, the proceeds of which were placed to their credit upon their general account.   He had no authority from Hedges so to use the stock.

"Burke & Co., and before them Lewis Burke, had been having numerous transactions of this general character with the bank for a considerable period of time. The bank had loaned them large sums of money and taken from them numerous notes of theirs. At this time they were in good standing, financially and otherwise, with the bank and in the estimation of business public. They would seem to have been in good standing with complainant. also, since he paid them for this stock in full before delivery. In a few days after the transactions above detailed, they were discovered to be wholly insolvent.

"Upon the day the complaintant sent Burke & Co. his check for this stock he went out of the city and was gone about a week. Upon his return he made several requests of them for the delivery of the stock, but was put off from time to time with excuses, until the crash came about the middle of August. Then he found the bank claiming this stock under the hypothecation aforesaid and a sale thereof under the power given in the note. Hence this lawsuit.

"From the moment that complainant paid for this stock, if not from the moment that Post & Flagg purchased it, the title vested in him. Post & Flagg had a lien upon it for the purchase price advanced by them; but, subject to their lien, complainant's title was absolute.

"Ordinarily, one intrusted with the possession of personal property by the owner, but without authority to sell or dispose of it, cannot transfer title to it even to an innocent purchaser. In such cases, the purchaser, no matter how innocent he may be, acquires no better title than the seller himself had.

"There are exceptions to this general rule, one of which is invoked and relied upon in the instant case, namely,

where the owner has conferred upon another the documents which constitute the usual *indicia* of ownership, as a certificate of stock, a bill of lading, or the like, or has otherwise held him out as having ownership or by the power of disposal, he is estopped to deny the ownership or authority of that other as against an innocent purchaser from him for value. Now, it is true that complainant knew that the course which he contemplated would be pursued by Burke & Co. in the purchase and delivery of this stock, and which was pursued by them, would result in their coming into possession of the certificate of stock assigned in blank.

"Whether this was such a clothing of them with the apparent ownership and unlimited power of disposal as would estop him is not clear under the authorities. It is a question not necessary to be decided, because the proof shows that the bank knew that Hedges and not Burke & Co. was the owner of this stock. The original agreement between them and the bank to which reference has hereinbefore been made to the effect that they were not to buy stock for themselves, but only for others, was enough to put the bank on notice that this stock did not belong to Burke & Co. In addition to that, Burke testifies that when he pledged the stock to secure said $5,500 note he was asked by Mr. Higgins to whom this particular stock belonged, and that he told Mr. Higgins it belonged to Hedges. Mr. Higgins himself testifies as follows:

" 'X 5. And you asked him for whom he had bought that stock?

" 'A. Yes, sir.'

" 'X 6. And he told you Mr. M. M. Hedges?

" 'A. I don't remember whether he told me Mr. Hedges or not, but he told me somebody.

" 'X 7. He told you the name of the purchaser?

" 'A. Yes, sir.'

"It thus stands admitted that the bank knew that the stock did not belong to Burke & Co., and the proof is all but conclusive that it knew the owner to be the complainant Hedges. Now, it may be assumed that the fact that Hedges had allowed this certificate to come into the possession of Burke & Co., known to be brokers, would be sufficient to protect any person who took it from them for value and without notice that they were disposing of it otherwise than for the benefit of the owner. But here the transaction was itself notice of this very fact. They were hypothecating Hedges' stock to secure their own note. The bank took the risk that Burke & Co. had authority to do this. Owing to the good standing which Burke & Co. enjoyed at the time, the bank may have been warranted as a matter of business policy in relying upon their having such authority, without questioning them further and without inquiring of Hedges. Nevertheless, if the bank chose to put faith in Burke & Co., it was its risk, not Hedges'.

"Although Hedges was then in the city and was a man of large wealth, and although the certificate had lain in the bank for four or five days, the bank assumed that Hedges had not paid for the stock and that Burke & Co. had taken up the draft with their own funds. This assumption was the occasion of the inquiry to whom the stock belonged. The bank wanted to know who would be expected to call and take up the stock by paying the price. There is authority for the proposition that a broker who has advanced the purchase price of stock for his client may make a valid pledge of the stock to the extent of his interest and is not guilty of conversion in so doing. But

in such case the pledgee acquires the interest of the broker and no more.

"Again it is the pledgee's risk.   In the instant case the broker had no interest.

"One argument in favor of the bank, upon its face a very strong one, is upon the theory that it was the bank's fund or credit which Burke & Co. used to pay Post & Flagg's draft and thus secure possession of the stock.   On the brief for the bank it is stated thus:

" 'The bank saw Burke pay the draft.   It knew he used his own means because it loaned him the money with which to make the payment.   .   .   .

" 'Burke was guilty of a wrong against Hedges if, indeed, he was not guilty of a felony.   But all the equities are in favor of the bank.   He got money from both Hedges and the bank to pay for the stock.   He used Hedges' money for his own purposes and paid for the stock with the bank's money.   The stock would be in the hands of Post & Flagg unpaid for and would not be here for Hedges to claim if the bank had not furnished the money to pay for it.   The claim of the bank, whose money paid for the stock, is much stronger than that of Hedges whose money Burke used for other purposes.'

"But the proof does not make out the fact upon which this argument is based.   There was no connection between Burke's payment of the draft and his making the $5,500 note.   At the time he made the note, he had already paid the draft with his firm's ˙check and had the stock in his possession.   Mr. Higgins, with whom he negotiated the $5,500 note, did not know when or how Burke had paid the draft, and obtained the stock.   Moreover, when Burke presented the check in payment of the draft, Burke

& Co.'s balance on their account at the bank was more than enough to pay it. They had theretofore deposited Hedges' check to their credit, and there is nothing to show that his money did not enter into and form a part of said balance in their favor. There is therefore no more reason for saying it was the bank's money which paid the draft than for saying it was Hedges'.

"Upon the whole case I am of opinion that complainant is entitled to recover of the bank the market value of the stock."

The remaining question for determination is at what time is the value of the stock to be ascertained?

At the time of the purchase, the complainant paid the market value therefor, which was $21 per share. At the time he gave his deposition it had attained a market value of $29 per share, while at the time Burke gave his deposition the value was $42 per share.

Ordinarily, in cases of conversion, the measure of damages is the market value of the property at the date of the conversion.

In 38 Cyc., 2096, it is said:

"Courts are not agreed as to the correct measure of damages for the conversion of shares of stock. There are three recognized rules: (1) The value of the stock at the time of conversion; (2) the highest value intermediate conversion and trial; and (3) the highest value between conversion and the expiration of a reasonable time within which plaintiff might have procured other like stock in the market."

The chancellor adopted rule No. 3 as the correct measure of damages, and the complainant has assigned this for

error, insisting that he should have followed rule No. ·2 in computing the damages.

The rule adopted by the chancellor is called the "New York Rule." Originally, the New York court adopted the rule contended for by the complainant in the cases of *Romaine* v. *Van Allen*, 26 N. Y., 309, and *Markham* v. *Jaudon*, 41 N. Y., 235. In the latter case, however, the decision was by a divided court. Subsequently, in *Baker* v. *Drake*, 53 N. Y., 211, 13 Am. Rep., 507, the former decisions were overruled, and the rule above referred to as the "New York Rule" was adopted. Speaking with reference to the old rule, that is, the highest value intermediate conversion·and trial the court said:

"When we consider the opposition which this rule has constantly encountered in the courts, the variety of the judgments in the cases in which it has been invoked, and the doubting manner in which it has been referred to by eminent jurists, whose decisions are cited in its support, it cannot be regarded as one of those settled rules to which the principle of stare decisis should apply. See *Starbuck* v. *Cortazzi*, 2 Cr. Mees. & Rosc., 165; 2 K. Com., 637 (11th Ed.), note; *Owen* v. *Routh*, 14 C. B., 327; *Williams* v. *Archer*, 5 Man. Gr. & Scott, 318; *Archer* v. *Williams*, 2 Car. & Kir., 26; *Rand* v. *White Mountain R. R. Co.*, 40 N. H., 79; *Brass* v. *Worth*, 40 Barb., 648; *Pinkerton* v. *Manchester R. R.*, 42 N. H., 424, 45 N. H., 545, and the able review of the subject in Sedgwick on Damages, pp. 550 to 555, note (5th Ed.).

"It seems to me, after as full an examination of the subject as circumstances have permitted, that the dissenting opinions of Grover and Woodruff, JJ., in *Markham* v. *Jaudon*, embody the sounder reasons, and that the rule

147 Tenn.—17

of damages laid down in that case and followed in the present one is not well founded, and should not be sustained."

Subsequently, the supreme court of the United States adopted the "New York Rule" in the case of *Galigher* v. *Jones,* 129 U. S., 193, 9 Sup. Ct., 335, 32 L. Ed., 658, and in the opinion the court said:

"Perhaps more transactions of this kind arise in the State of New York than in all other parts of the country. The rule of highest intermediate value up to the time of trial formerly prevailed in that State, and may be found laid down in *Romaine* v. *Van Allen,* 26 N. Y., 309, and *Markham* v. *Jaudon,* 41 N. Y., 235, and other cases, although the rigid application of the rule was deprecated by the New York superior court in an able opinion by Judge DUER, in *Suydam* v. *Jenkins,* 3 Sandford (N. Y.), 614. The hardship which arose from estimating the damages by the highest price up to the time of trial, which might be years after the transaction occurred, was often so great, that the court of appeals of New York was constrained to introduce a material modification in the form of the rule, and to hold the true and just measure of damages in these cases to be, 'the highest intermediate value of the stock between the time of its conversion and a reasonable time after the owner has received notice of it to enable him to replace the stock.' This modification of the rule was very ably enforced in an opinion of the court of appeals delivered by Judge RAPALLO, in the case of *Baker* v. *Drake,* 53 N. Y., 211, which was subsequently followed in the same case in 66 N. Y., 518, and in *Gruman* v. *Smith,* 81 N. Y., 25; *Colt* v. *Owens,* 90 N. Y., 368; and *Wright* v. *Bank of Metropolis,* 110 N. Y., 237.

"It would be a herculean task to review all the various and conflicting opinions that have been delivered on this subject. On the whole it seems to us that the New York rule, as finally settled by the court of appeals, has the most reasons in its favor, and we adopt it as a correct view of the law."

In *Dimock* v. *United States National Bank,* 55 N. J. Law, 296, 25 Atl., 926, 29 Am. St. Rep., 643, the court approved the "New York Rule" and said:

"In some of the sister States the rule of the highest intermediate price before the trial has been adopted. In New York and in most of the sister States, as well as in the supreme court of the United States, the formula which has been called the New York rule has been adopted, and is the rule which will accomplish the most complete justice in the ordinary transactions between the broker and his customer and his customer dealing in stocks when an unauthorized sale is the act of conversion. In such cases the customer has a choice of remedies. He may claim the benefit of the sale and take the proceeds; he may require the broker to replace the stock, or replace it himself and charge the broker for the loss, or he may recover the advance in the market price up to a reasonable time within which to replace it after notice of the sale."

The court of chancery appeals, in the case of *Morris* v. *Wood,* 35 S. W. 1013, in an opinion by Justice NEIL, subsequently Chief Justice of this court, reviewed the authorities and adopted the "New York Rule," and the decree in that case was affirmed orally by this court.

For the reasons set forth in the decisions, from which we have quoted, we are of the opinion that the "New York Rule," in such cases, is more reasonable and just than ei-

ther of the others and the chancellor correctly adopted it as a basis for determining the sum which the complainant was entitled to recover.

Upon the whole, we find no error in the decree of the chancellor, and it will be affirmed, and the defendants will be taxed with the costs of the appeal.