## GRIFFITHS v. HAMBLEN NAT. BANK.

Eastern Section.  March 4, 1935.

Petition for Certiorari denied by Supreme Court, October 12, 1935.

A. T. Drinnon and Taylor & McCanless, all of Morristown, for appellant.

Ben B. Simpson, of Loudon, Gamble, Goddard & Gamble, of Maryville, and R. R. Kramer, of Knoxville, for appellee.

PORTRUM, J.  The complainant, Miss Effie Griffiths, is a lady 69 years of age, living at Greenback, Loudon county, Tennessee.  She possessed considerable property, and manages her business affairs in person, buying stock in banks and purchasing Liberty bonds.  A short time before the transaction from which this litigation arose, the complainant became acquainted with two promoters, namely, E. Hill Smith and E. A. Swank, who were at Maryville, Tennessee, attempting to organize a bank under the name of Maryville Savings & Loan Corporation, and these promoters induced the complainant to purchase some of the stock.  This bank was organized, and the

promoters then went to Morristown for the purpose of organizing a bank of a similar nature there, and also one at Jefferson City, Tennessee. They had gained a knowledge of the complainant's financial affairs, and E. A. Swank called upon her again on March 23, 1931, to induce her to take stock in the banks then being organized, but she declined to take additional stock. On this occasion she told Swank that her Liberty bonds aggregating $5,000 were in the vault of the bank of Greenback, and the bank of Greenback was insolvent and in the hands of the state superintendent of banks for liquidation. Swank represented to the complainant that she might have trouble in recovering her bonds from the receiver, since they were not in a safety deposit box, but had been left in the bank's vault without evidence to earmark them as the property of the complainant. He suggested that she recover the bonds and place them in the Maryville Savings & Loan Corporation, a bank in which she was interested.

She did recover the bonds and turned them over to Swank to be deposited in the Maryville Savings & Loan Corporation, and took his receipt, describing the bonds by number and the aggregate amount of $5,600, signed by the corporation, by E. A. Swank, and dated March 23, 1931. On April 9 Swank again returned to the home of the complainant, and represented to her that he had almost completed the organization of the bank in Morristown, having subscribed $19,000 of the $25,000 required subscription, and that he had to have paid in as capital $25,000 before the banking department would permit the opening of the bank. He suggested to her that she loan him $5,000 of her Liberty bonds to be deposited in the coffers of the bank in order to meet the requirement of the law and permit the immediate opening of the bank after an examination by the banking department, and that he, upon the next day after the opening of the bank, would return the bonds to her. He offered to pay her $100 for the use of the bonds for the few days he represented as necessary. She did not understand how he could afford to do this, and he explained to her that it would require some time to procure sufficient subscriptions to open the bank, and his traveling expenses, gasoline bills, and other incidental expenses would more than consume this amount. She agreed to accept $100 and loan the bonds for the purpose above stated. Swank then pulled the bonds out of his pocket and stated to her that she would have to sign the bonds to show that they were genuine. Until then she did not know that Swank had the bonds in his possession, but she said nothing in protest. And she then, at the suggestion of Swank, signed the bonds in blank and turned them over to him for the purpose of using them as the assets of the bank at Morristown in order that the promoters might open it, but with the expectation that Swank would remove the bonds as assets of the bank immediately after the examiners had opened the bank and return the bonds to her.

Swank took these bonds to Morristown and placed them in his safety deposit box in the Hamblen National Bank, where they remained until they were later hypothecated by Swank. On May 28 Swank wrote this letter from Morristown, Tennessee:

"Dear Miss Griffiths: I am writing in regard to the opening of our bank. Our bank at Morristown, as you likely noticed in the paper, was opened on the 20th; but owing to the fact we have had no stockholders meeting, yet, and will not have until the tenth of July; I thought we would plan having you up at that time, as we expect to open at Jefferson City about that time.

"My wife joins me in wishing you good health and hoping you will be with us at that time.

"Yours,

"E. A. Swank."

Miss Griffiths replied to this letter, stating that she could not come to the opening of the Jefferson City bank, but she made no demand for the return of her bonds, which were then in Swank's possession in his safety deposit box.

On July 18, 1931, Swank made application to the Hamblen National Bank, the defendant, for a loan of $4,000 to be secured by $5,000 of Liberty bonds, and the bank, having no reason to suspect the good faith of Swank or his ownership of the bonds, agreed to make the loan, but, when the bonds were produced, it was discovered that they were signed in blank by the registered holder, Miss Griffiths, and that her signature had not been acknowledged as per the instructions printed upon the bonds. The bank declined to make the loan until Swank had secured the acknowledgment of Miss Griffiths in the manner provided in the printed instructions upon the bonds. Swank then went to Maryville and called upon John M. Clark, president of the Bank of Blount County, and requested him to fill out the acknowledgment as per the instructions. Miss Griffiths was not present, and therefore did not personally appear before him, but he was acquainted with her signature, she being a depositor in his bank, and, after comparing the signature upon the bonds with her signature upon her checks then in the bank, he satisfied himself that the signature was genuine, and proceeded to take the acknowledgment, signing it in his official capacity and attaching the seal of the bank as evidence of the official act.

Swank had represented to Miss Griffiths that he could not negotiate the bonds until this acknowledgment had been taken, and for this reason she was safe in turning them over to him, and she testified that she relied upon this fact as a safeguard and that she could not foresee that any one would be so negligent as to take the acknowledgment in her absence and without her knowledge.

After procuring the acknowledgment, Swank returned to Morristown and made a loan for $4,000 upon the face of these bonds, which

were deposited as collateral, and on the 4th day of August following he procured an additional loan of $1,000 secured by the same bonds, making the aggregate loan $5,000. Swank and his associate, Smith, soon thereafter disappeared, and Miss Griffiths was unable to find them or her bonds, but, after the maturity of the notes which were secured by the bonds and payment being in default, the bank advertised the bonds for sale under the contract agreement appearing in the notes. Then some one notified Miss Griffiths of this fact, and she immediately filed suit to recover the bonds or their proceeds and to enjoin the foreclosure or sale of the bonds by the defendant. The defendant filed its answer averring its ownership and filing a cross-bill or the answer as a cross-bill, making the Bank of Blount County and John M. Clark, its president, parties defendant, and praying for an adjustment of the equity between the parties. The Bank of Blount County and John M. Clark attacked the jurisdiction of the court by filing a motion to dismiss the cross-bill as to them, basing it upon two grounds: First, the court had no jurisdiction of the persons of the defendants for the reason that their residence was in Blount county, and that the complainant was not a resident of Hamblen county; and the second ground was that the cause of action laid in the cross-bill was a tort, and a court of equity had no jurisdiction of the tort action. The chancellor sustained this motion and dismissed the cross-bill. After a hearing, he gave judgment in favor of the complainant against the Hamblen National Bank, holding that the bonds were assignable and not negotiable, and the bank took only such title as its immediate assignor had, and, since the assignor had no title, the bank acquired none. From this decree the bank has appealed.

The appellant's position is that, under the ruling of the Treasury Department of the United States government, as construed and interpreted by the Attorney General of the United States, it acquired the legal title to the securities or a title that the United States government would recognize to the exclusion of the title of Miss Griffiths, and that the state courts will recognize and enforce the title as recognized and enforced by the United States government.

But the appellant further insists that, if it acquired no legal title to the securities, nevertheless its equities are superior to the equity of the appellee, and that a court of equity will enforce the maxim, "Where one of two innocent persons must suffer a loss, he should suffer whose act occasioned the loss." And the facts of this case make it inequitable for the court to enforce the maxim, "Where the equities are equal, the law will prevail." The chancellor seems to have enforced the latter maxim. The case in its finality becomes a question of which of these maxims the court should enforce.

When the facts were first considered, it did not appear that the first maxim was applicable, for the reason that the loss appeared

to have been caused by a third party not before the court. Under this state of facts the maxim would read "Where one of three innocent persons must suffer a loss, he should suffer whose act occasioned the loss." So, if the one whose act occasioned the loss is not before the court, then the court is powerless to enforce the maxim. But, upon further investigation, it was discovered that the third party, John M. Clark, who took the false acknowledgment to the signatures upon the bonds, did not commit an act of proximate negligence causing the loss, for the Hamblen National Bank could have accepted the bonds as collateral without the acknowledgment and acquired the equitable right to them upon the faith of the owner's indorsement in blank. This being true, the bank's precaution in requiring the acknowledgment should subtract nothing from its equitable rights. This precaution on the part of the bank may have been of great aid to Miss Griffiths, but, since it was of no aid and added nothing to the rights of the bank, because it was void, it should not defeat the bank's equity. We say, then, that the third party can be disregarded, and we have two innocent persons, one of whom must suffer a loss, and the loss should be borne by the one whose act occasioned the loss.

This conclusion is based upon the theory that Swank could make a legal assignment of the bonds in the absence of the acknowledgment of the signature of the original holder, and we say that he could upon the authority of the opinion of the Attorney General of the United States and the Treasury regulations contained in the opinion which is found in volume 34 Op. Attys. Gen., page 262. The Attorney General's opinion in its entirety will appear in a note to this opinion.[1]

---

[1] Authority to Issue Duplicates in Lieu of Lost or Stolen Registered Liberty Bonds.

Certain Liberty bonds were purchased by the First National Bank of Bagwell, Tex., from the registered owner thereof, who signed his name to the blank assignments on the back of said bonds but whose signature thereto was not attested in compliance with the regulations of the Treasury Department, and these bonds were thereafter lost by said bank. Under such circumstances, the Secretary of the Treasury is not authorized by sections 3704 and 3705 of the Revised Statutes to issue duplicates in lieu of said lost bonds.

Registered Government bonds assigned in blank are in effect payable to bearer and lack the protection of registration, and when lost or stolen from the possession of their rightful owner, duplicates therefor may not be issued by the Secretary of the Treasury.

Department of Justice,
August 14, 1924.

Sir: I have the honor to acknowledge receipt of your letter of June 18, 1924, stating that the First National Bank of Bagwell, Tex., has made application under the provisions of Section 3704, Revised Statutes of the United States [31 U. S. C. A., sec. 737], for the issue of duplicates in lieu of two United States registered bonds lost or stolen from the possession of the bank.

It appears from the file transmitted with your letter that the bonds

were of the Third and Fourth Series Liberty Loans inscribed in the name of "J. C. Henry" and "John C. Henry," respectively; that Mr. Henry sold the two registered bonds to the First National Bank of Bagwell and signed his name to the form of assignment printed on the back of each bond; that the assignments were in blank and Mr. Henry did not acknowledge his signature in the presence of an officer authorized by the regulations of the Treasury Department to attest assignments of Government bonds. It is also stated that the bonds have been lost or stolen, and the fact of the loss or theft has been satisfactorily established.

My opinion is requested as to whether or not an assignment, the signature to which is genuine but which has not been completed by attestation at the time of loss or theft, but which may wrongfully be completed at a later date, is an assignment in blank or for exchange, thereby rendering relief under Section 3704, Revised Statutes, impossible.

The law authorizing the Third and Fourth Liberty Loans is contained in Act of September 24, 1917, chap. 56, Sec. 1, 40 Stat., 288, as amended by Act of April 4, 1918, chap. 44, 40 Stat., 502, and by Act of July 9, 1918, chap. 142, 40 Stat., 844 [31 U. S. C. A., sec. 752]. Section 1 reads in part as follows:

"The bonds herein authorized shall be in such form or forms and denomination or denominations and subject to such terms and conditions of issue, conversion, redemption, maturities, payment, and rate or rates of interest, not exceeding four and one-quarter per centum per annum, and time or times of payment of interest, as the Secretary of the Treasury from time to time at or before the issue thereof may prescribe."

In pursuance of the authority conferred upon him the Secretary of the Treasury has issued certain regulations prescribing the mode of assigning Liberty bonds and the effect of an assignment in blank. Paragraph 5, extract No. 12, of paragraph 32, Treasury Circular No. 300, dated July 31, 1923, provides:

"Assignments of registered bonds may be made to a specified person, or in blank, or may be made to the Secretary of the Treasury for transfer to a specified person, or to the Secretary of the Treasury for exchange for coupon bonds. Registered bonds assigned in blank, or bearing assignments for exchange for coupon bonds which do not restrict delivery, are in effect payable to bearer and lack the protection of registration, since title thereto may pass by delivery without further assignment. The Treasury Department or notes thereafter are received for transfer, evchange, or payso assigned, and will not enter caveats against their transfer, exchange, or payment even though reported lost or stolen."

Paragraph 1, extract No. 22, of paragraph 86, Treasury Circular No. 300, dated July 31, 1923, provides in part as follows:

"Registered bonds or notes assigned in blank, or bearing assignments for exchange for coupon bonds or notes without instructions restricting delivery, are in effect payable to bearer, since title thereto may pass by delivery without further assignment or indorsement. The Treasury Department can accordingly grant no relief on account of the loss or theft of bonds or notes so assigned, and will not enter caveats against their transfer, exchange, or payment, if reported lost or stolen. The Treasury Department assumes no responsibility with respect to bonds or notes so assigned, but if notified of their loss or theft will make appropriate notations on its records, and, in the event that the bonds or notes thereafter are received for transfer, exchange, or payment, may require the person presenting such bonds or notes to submit evidence showing whether or not he is a bona fide holder in due course. If it appears that the person presenting the bonds or notes is not a bona fide holder in due course, the Department may withhold transfer, exchange, and payment, and in any event it will notify the registered owner of the result of the inquiry." The above-cited regulations appear to cover the case submitted by the First National Bank of Bagwell, and precludes the relief sought under the provisions of Section 3704, Revised Statutes [31 U. S. C. A., sec. 737].

The bonds were received by the bank from Mr. Henry, who signed his name to the blank assignments on the back of the bonds, but the bank failed to have the signature properly attested as required by the Treasury Department regulations. Although the assignments were not in accordance with Treasury regulations and, therefore, insufficient to warrant the Treasury Department in transferring the bonds on the books of the Department, yet the assignments in blank, coupled with delivery of the bonds, were sufficient to transfer ownership to the bank. Treasury Circular No. 300, supra; In re Stockam, 193 Iowa, 823, 186 N. W., 650 [22 A. L. R., 765.]

In the case above cited the Supreme Court of Iowa had under consideration the transfer of registered Government bonds by assignments before a notary public and not in compliance with the regulations of the Treasury Department. The court said:

"Is there not a clear distinction to be recognized between an assignment of a registered bond containing the provisions quoted above, for the purpose of effecting a transfer that will meet the requirements of the Secretary of the Treasury for the registration thereof, and an assignment intended only for the purpose of transferring title to an assignee? We are of the opinion that such distinction does exist, and that the assignments in question are sufficient to pass title to the assignees named. It may be that the assignees, under other circumstances than those shown in this case, would have some difficulty with the Secretary of the Treasury in obtaining interest payments and a settlement of the bonds at maturity, but this does not concern appellants, nor affect the validity of the assignments. So far as we are advised, no similar question has arisen affecting bonds of the series in question, or involving similar requirements of the Secretary of the Treasury, but we are satisfied that the language of the quoted provision should not be so construed as to impose an absolute prohibition upon the right of the owner to transfer title to the bond by assignment on the back thereof in the form provided, although not witnessed in the manner or by a person authorized by the Secretary of the Treasury."

The bonds assigned in blank by Henry and delivered to the First National Bank of Bagwell were in effect payable to bearer, as provided by Treasury regulations, and title thereto passed to the bank by delivery of the bonds as in the case of coupon bonds, and the bonds so assigned lost the protection of registration on the books of the Treasury Department.

Assuming that the First National Bank of Bagwell is now the rightful owner of the bonds in question, and that the loss or theft of the bonds has been satisfactorily established, is the Secretary of the Treasury authorized to issue duplicate bonds in lieu of those lost or stolen?

Sections 3704 and 3705, Revised Statutes [31 U. S. C. A., secs. 737, 738], prescribe the circumstances under which duplicates of lost registered bonds may issue. Said sections provide:

"Sec. 3704. Whenever it is proved to the Secretary of the Treasury, by clear and satisfactory evidence, that any duly registered bond of the United States, bearing interest, issued for valuable consideration in pursuance of law, has been lost or destroyed, so that the same is not held by any person as his own property, the Secretary shall issue a duplicate of such registered bond, of like amount, and bearing like interest and marked in the like manner as the bond so proved to be lost or destroyed.

"Sec. 3705. The owner of such missing bond shall first file in the Treasury a bond in a penal sum equal to the amount of such missing bond, and the interest which would accrue thereon, until the principal thereof becomes due and payable, with two good and sufficient sureties, residents of the United States, to be approved by the Secretary of the Treasury, with condition to indemnify and save harmless the United States from any claim because of the lost or destroyed bond."

It will be observed that the relief provided for by Section 3704, Revised Statutes, is limited by the phrase "so that the same is not held by any person as his own property." The registered bonds having been assigned

in blank, thereby making them payable to bearer, the assignment may be completed by the present holder and the bonds disposed of to an innocent purchaser for value. Under such circumstances duplicate bonds may not be issued by the Secretary of the Treasury under the provisions of Section 3704, Revised Statutes, even though satisfactory evidence of the . loss or theft of the bonds is submitted by the rightful owner.

It is clear from the restriction contained in Section 3704 that it is the purpose of the statute to grant relief only where the registered bonds retain their character as registered bonds and the protection of registration, and that when registered bonds have been so assigned as to make them payable to bearer and thereby lose the protection of registration, they may then be "held by any person as his own property," and when lost or stolen from the possession of their rightful owner, duplicates therefor may not be issued by the Secretary of the Treasury.

I have the honor to advise you, therefore, that, from the facts and circumstances stated by you, you are not authorized by Sections 3704 and 3705, Revised Statutes, to issue duplicates in lieu of the bonds purchased by the First National Bank of Bagwell from John C. Henry and thereafter lost by said bank.

Respectfully,

Harlan F. Stone.

To the Secretary of the Treasury.

The registered bonds in question are not made payable either to the order of the holder or bearer, and, under the Negotiable Instruments Act (Code 1932, sec. 7325 et seq.), a paper, to be negotiable, must be payable either to the order of the payee or bearer. An assignee of a nonnegotiable instrument with the status of a ''bearer'' holder is a unique relationship, and it is defined in the opinion of the Attorney General and is recognized by the Treasury Department. The Iowa court (In re Stockham's Estate, 193 Iowa, 823, 186 N. W., 650, 22 A. L. R., 765) holds only that a valid assignment can be made in the absence of the acknowledgment required to entitle the transfer to the registration status. If the Treasury Department of the United States government will recognize the defendant bank as the legal holder of the bonds in question, having purchased them upon the faith of the blank indorsement, without notice of any defect in the title of the assignor, and for a valuable consideration, then it seems to us that it is the duty of the state courts to give full faith and credit to the rulings of the Attorney General and enforce the government contract as enforced by the government itself. If the state courts should require the bank to turn over the bonds to Miss Griffiths and the bank then filed a claim before the Treasury Department protesting payment to Miss Griffiths, then the Treasury Department, following the ruling of its Attorney General, would decline to pay the bonds, and there would be no obligation upon the Treasury Department to recognize a decree of the state courts and reverse its former practices based on the opinion of the Attorney General.

But there is no warrant for a recovery in this case under the law of the state; if Miss Griffiths' deliberate act in signing these bonds in blank and for the express purpose of showing that they were

"genuine," to be used to deceive the banking department of the state of Tennessee, caused the loss, then she has no grounds to complain because Swank deceived another and not the superintendent of banks. The defendant bank is guilty of no act of negligence; it did everything it could for its own protection, and its act tended to protect the complainant, and it was through no fault of the bank that it did not. Miss Griffiths' act in signing these bonds in blank and turning them over to Swank was an act of gross negligence, and we have to excuse her on account of her age and intelligence, for otherwise her act was reprehensible.

The maxim is peculiarly applicable to the facts of this case; the government issues registered bonds in large numbers, and they are used extensively by the holders as collateral, and the government recognizes the right of transfer upon indorsement; therefore, to hold that the indorsement means nothing and that the party takes them at his own risk, regardless of the fact that the transfer appears regular upon its face, amounts to the destruction of the transferability of these obligations, and this is a right of considerable value. This would retard commerce and handicap the holder of all registered bonds, and to offset this loss only a few, who had placed confidence in unworthy parties and had been betrayed, would be benefited, and then to the loss of some innocent third person who had parted with his money on the faith of the indorser and without notice of a defect in title. This maxim has been inforced repeatedly in our reported cases and where the instrument was not a negotiable instrument. In the case of Arendale v. Morgan & Co., 5 Sneed, 703, the complainant was defrauded out of a negro slave, but he had given a bill of sale evidencing the sale, and he turned the negro over to the defrauder, who had hypothecated the bill of sale giving possession of the negro, and the court held the rightful owner had committed the act which occasioned the loss and should bear the loss. We will refer to only a few of our Tennessee cases. Gilley v. Harrell, 118 Tenn., 115, 101 S. W., 424; Hedges v. Burke, 147 Tenn., 247, 247 S. W., 91; Young v. Iron Co., 85 Tenn., 189, 198, 2 S. W., 202, 4 Am. St. Rep., 752; Jefferson Bank v. Chapman, etc., Co., 122 Tenn., 415, 123 S. W. 641.

"Parties must take the consequences of the position they assume. They are estopped to deny the reality of the state of things which they have made appear to exist, and upon which others have been led to rely. Sound ethics require that the apparent, in its effects and consequences, should be as if it were real, and the law properly so regards it." Casey v. Galli, 94 U. S., 673, 680, 24 L. Ed., 168.

A case peculiarly in point in view of the fact that it was not necessary to acknowledge the indorsement to make a valid assignment of the bonds between the parties is the case of Baldwin v. Ely, 9 How., 580, 600, 13 L. Ed., 266. This case dealt with Treasury certificates, which had been assigned by indorsement, and an innocent purchaser

was misled by the indorsement to expend his money upon the faith of the indorsement. These certificates were not negotiable, but the court said:

"And the possession of them by the appellee, with the customary form of assignment indorsed upon them, in the handwriting of the party to whom they were originally issued, entitles him to the benefit of the legal presumptions in favor of his rights which always arise from possession, until proof is offered to the contrary."

We are of the opinion that the complainant is not entitled to recover, and her suit must be dismissed, at her cost.